Our last case this morning is United Therapeutics v. Liquidia Technologies, 2023-1805. Mr. Kostin. Good morning, Your Honors. It may have pleased the Court. The Board below committed three independently reversible errors. First, under a de novo standard, the Board substituted hypothetical not-in-evidence abstract books in place of the JESC and JAHA journal article supplements identified as prior art in the petition. Second, the Board used hindsight to determine a, quote, delivered dose based solely on express assumptions concerning fill volumes and prescribed volumes lacking substantial evidence of delivered dose. Counsel Lee. Yes, Your Honor. This prior art here, the 212 patent, and it's your own patent, it discloses essentially the same invention, including powder by inhalation, and the variations here seem to be just within the normal skill of the art. No, Your Honor. We absolutely disagree with that. The 212 patent is a different patent which has no dose regimen, the single event dose, the particular amount of the dose to be delivered, or in one to three breaths. All of the evidence that is contained in the disclosures in the patent itself, the 212 patent, are all solution-based, and there is one claim that allows for inhalation of a dry powder with a certain limitation with respect to micron diameter, average micron diameter of the powder. Are you showing unexpected properties over the 212 disclosure? We absolutely did present evidence of exactly that below in terms of, to the Board below, with respect to the unexpected nature of dry powders. Dry powders, the only evidence that was presented to the Board below, are that dry powders are vastly different from solutions. Dry powders are mentioned in the 212 patent. They are, Your Honor, but again, at oral argument, we were asked specifically about that, and of course, we understand that the 212 patent is enabled. But as this Court has recognized, enablement does not forego a reasonable expectation of success in terms of an obviousness analysis. Moreover, Your Honor, there was evidence of the enhanced relative amount of troprostanol, which is a highly potent compound, to be delivered by this dry powder in one to three breaths. That evidence was presented to the Board below and is vastly different and actually demonstrates the fundamental error that was committed by the Board below in assessing those dry powder claims. The dry powder claims here, the Board committed error by not evaluating the dry powder claims against the particular limitations that it was, from which those claims depend in violation of 112 section paragraph 4. Each claim is a separate invention, and so the way that the Board actually went ahead and performed the analysis, and we can see this in APPX 34 and 35, is it just assumed based upon solution evidence only that the dosage regimen was found in the ART, and then said now all I need to do is to go ahead and find, where's Waldo style, any teaching of dry powder anywhere in the ART. Divorced from the particulars of that particular dosage regimen and scheme, which is the heart of the invention here. That's the heart of what makes the 793 different from the 212, Your Honor. Do you want to talk about whether the journal abstracts were prior out? Oh, absolutely, Your Honor. I'm happy to do that. The journal abstracts here, well, first of all, the thing that was presented in the petition were journal supplements, not abstract books. Abstract books is a fiction that came about during deposition of our expert, and only upon reply did these abstract books start to take on a bit of life of their own by virtue of a sentence or a section in the petitioner's reply, Your Honor. Abstract books are an abstract of a publication, correct? Well, the abstract, an abstract is the front piece of a general larger publication, right? Generally, they define or give a road path as to where the publication is going to go. It talks about... Exactly right. Is it the case that in both of the prior ART references that we have that the abstract discloses the dosage limitation that we're addressing? No, we absolutely disagree with that, Your Honor. And in fact, we think there's no substantial evidence to support the notion that one can derive the dosage from that information. If we look to exactly that issue and go and track down and chase down the support, there are only essentially three, there are only essentially two witnesses who will, to sponsor that testimony. There's Dr. Gonda who testifies that in one of the declarations says conventionally it's understood to deliver of one to five milliliters. When you actually look at that conclusory statement and look to the materials upon which that depends and he relies upon to support that statement, you only find that it's fill volumes, not dry powder, but it's fill volumes and prescribed volumes. He relies upon four or five approved product labels with respect to that. And as a result, that simply cannot hold as qualifying for substantial evidence. The other person who testified about this was Dr. Hill and Dr. Hill relies on Dr. Gonda. As a result, the entirety fails here because there is no substantial evidence to support the notion that the delivered dose here can be calculated based upon the information contained either in those journal article supplements or by virtue of the associated product labels that Dr. Gonda depends from. In fact, our expert, Dr. Waxman, specifically testified at APPX 3186. I don't know that we could really say for sure how much was delivered. So again, the claims require a particular dose to be delivered here. All the evidence that was presented in the petition and all the way through the proceeding had to do with how much volume you pour into the actual vessel that's going to nebulize or aerosolize the particular drug product. None of that has anything to do with the amount that actually gets to the patient that's actually delivered. And that's an utter failure of proof. And we submit supports the notion of an outright reversal because there's no facts presented pertaining to delivered dose upon which you could support the conclusion that the claims, that the prior art teaches delivered dose. And that's even assuming that the journal supplement abstracts are prior art in the first instance, Your Honor. Here we take grave issue with that. Those journal article supplements were the things that were relied upon in the petition as publications. And there was fighting back and forth about indexing and so on and so forth. Only after the board got smacked for having relied not upon publication but rather a research aid theory, did anything come up with respect to abstract books. Yes, Your Honor. The board said we find that both references were distributed sufficiently at professional conferences to be publicly accessible at the time of those conferences. By virtue of this public accessibility, both of them were printed publications early enough to qualify as prior art. Aren't those fact findings? That's a determination of qualification as prior art under 102B, which is a question of law dependent upon underlying facts. We submit, Your Honor, that whether you consider this to be qualification of prior art as a question of law, which is subject to de novo review, or if you consider it to be a question of substantial evidence supporting underlying facts, we should win and the court ought to reverse. Well, there's two issues here. One is whether the abstract even discloses the dosage limitation at all. That's one. And the other is whether the abstract was accessible. Exactly right. Exactly right, Your Honor. And so for all the reasons I just went through with you, Your Honor, with respect to the lack of substantial evidence supporting delivered dose, we think that we get a reversal there. Secondly, and more importantly, though, these journal abstracts, these journal supplement articles, are not what the basis upon which the panel below actually found public accessibility. Rather, it was dissemination of these phantom abstract books. There is no evidence whatsoever, there's no exhibit that they can say, here's the abstract book that was circulated. They don't have a witness. This is exactly the opposite of the Nobel BioCare case where you had somebody who said, I went to the conference, I saw it, I can vouch and corroborate that this was disclosed. Our precedent would generally support that accessibility is determined on whether the publication was at and available at a conference, not whether somebody actually walked off with it. So I think that's a tension. There's a tension there. But I'm more concerned in your claim that the abstract did not disclose the limitation to begin with. Well, we agree entirely that... The other side's going to argue that, correct? That's going to make it a substantial evidence issue. That would be a substantial... That issue is a substantial evidence issue across the board. We agree. And as I've just walked through, Your Honor, and I'm happy to walk through it in more detail if the Court has interest here, but at the red brief 43, there are essentially three bullet points that support this notion that there was a delivered dose. They cite to Gonda, they cite to Hill, and they cite to Dr. Waxman, our expert. Dr. Gonda, at APPX 1166 of paragraph 56,  but for all the reasons I just walked through with you, Your Honor, all of the supporting evidence says prescribed or dosing or filled. It has nothing to do with what's actually delivered. Counsel, you're into your rebuttal time, which you can save or use. Well, Your Honor, just let me summarize then very briefly and reserve some time for rebuttal. These abstract books never saw the light of day. There's no evidence that those abstract books even exist. And that's a proxy that's a fabrication by the Board to support the notion that these journal supplement articles, which are different, and we don't know that they're the same because we don't even know if the abstract books exist, became public, and that's a fundamental foundational error. In addition to the issue that's troubling you, Judge Rayner, which also troubles me. Thank you. We'll save the remainder of your time, and when you come back, perhaps you won't shout at us. Oh, I apologize. Mr. Suk Tuang? Good morning, Your Honors. May it please the Court. Sonia Suk Tuang on behalf of Laquitia. I'd like to get to the issue with respect to the abstract books. The Laquitia's petition provided evidence of public accessibility. It's the same theory that was presented in the petition and the same theory that the Board found public accessibility. And as Your Honor had noted, the issue was whether they could access those. Counsel, I mean, we have, as I understand it, at the conference, about 20,000 people signed up for the conference, correct? Yes, for both conferences, give or take. And then the claim is that these abstracts were made available to all the conferees upon their sign-up. Yes. Why is it you can't even come up with one? We have one, Your Honors. In the Board's decision on rehearing, where they denied rehearing, they cited the two copies of the Jesk abstract. And if you look at page 58 of the rehearing decision... Somebody received them or had them? I'll point out that the copy that the Board relied on is the abstract book. So if you go to appendix page 58, they cite a copy of Jesk, which is starting at appendix page 2681. And if you go to appendix page 2684, it says at the very bottom, this abstract book has been produced electronically by El Vercier. This abstract book, that is the copy. The abstract in that copy was the exact same abstract that was cited in the petition and also relied on the hearing denial. With respect to Jaha, the Board pointed in its rehearing denial, when you look at the face of Jaha, it provides the date of the conference. When you go to... The Board also found in its rehearing denial at page 60 that when you go to the abstract itself for Jaha, that page, it tells you the date where that abstract is presented and tells you the hall. Do you have a declarant? We do not have a declarant, but we don't need a declarant here, Your Honor. You don't need one, but it's a big stretch. You've got 20,000 people and you can't produce a single person that says, I went, I received, I'm satisfied. This conference was in 2004. When you look at the documents that were submitted with the petition themselves, that the Board relied on, and these are factual issues, this is determined for substantial evidence, the faces of the documents themselves dictate that the copies presented at the petition were copies of the abstract book themselves. When you look at Jaha, again, a copy that was submitted below before the Board, there's another copy at appendix page 7606. When you go to that page in Jaha that was presented to the Board and they accepted as evidence, there's an advertisement for a drug called Crestor and it says go to booth 2547. You don't need directions to go to a booth if it wasn't the abstract book. You don't need directions to go to hall 12 on Wednesday if the copies that were submitted in the petition were not the copies originally at the conference. But we don't need a declarant to say I've received it. In the Jazz Pharma case... Can you address the argument from the other side that even if the abstracts are publicly accessible, that this does not disclose the dosage limitation? Sure, yes. And that issue is determined by substantial evidence and we believe the Board's decision is amply supported by substantial evidence. The question is whether the JESSC abstract discloses 15 to 90 micrograms as claimed in the 793 patent. All of the experts agreed. Dr. Hill, Dr. Waxman, Dr. Gonda and the Board credited this testimony, that testimony which was given deference. All three experts concluded that at least one mil would be delivered. Dr. Hill said that, Dr. Gonda said that and Dr. Waxman testified that he's never administered less than at least one mil. And I think the at least is critical. When you look at the... And counsel talked about fill volumes. The Board considered the fill volume issue and they specifically said in their final written decision that even if we consider all of the factors presented by UTC in their response, substantial evidence, we still met our preponderance of the evidence standard in determining the dose. When you look at JESSC, it goes from 16 to 64 micrograms. At least one mil is going to give you at every single point within the 15 to 90 micrograms. And the issue is obviousness here, not anticipation. That's correct. And what the Board determined is that a person of ordinary skill in the art, when you look at JESSC, the person of ordinary skill in the art would determine based on the evidence it presented and considering the alternative arguments on fill volume and patient characteristics, that the person of skill in the art would still determine that JESSC teaches you delivery of at least one mil. And when you deliver at least one mil, you're going to follow in the scope of the 793 claims. What about unexpected results? Yes, and the Board did consider that at appendix pages 22 to 23. The evidence that UTC presented below and the evidence that they point to here, and it's a Seeger declaration, a Zemanian declaration, and a Waxman declaration. The Board considered that evidence and determined that those declarations and the evidence that UTC presented talked about trapostanol versus illoprost, a completely different drug. And the Board determined that UTC did not present evidence comparing trapostanol to the closest prior art, which would be inhalation of trapostanol. That's disclosed in the 212 patent, that's disclosed in JESSC, and that's disclosed in JAHA. UTC now argues here the same exact evidence they presented below that was disregarded, that was considered but not found sufficient by the Board. And they argue here that they did talk about trapostanol. But when you look at the citations that they point to, and again, it's appendix page 3983, appendix page 5524, appendix pages 4795 to 4797, the word trapostanol is mentioned there. Absolutely, but that's talking about the 793. The comparator is illoprost in every single instance, so the Board was correct in determining that the evidence of unexpected results did not compare trapostanol claimed in the 793 patent against the closest prior art. Even the 212 patent, as Your Honors have pointed out, the 212 patent discloses inhalation of trapostanol. That's the claim. That's disclosure. They didn't even compare that against the 212 patent. So we believe substantial evidence supports the Board's finding on the dosing. We believe that the Board was correct in its consideration and decision not to rely on unexpected results with respect to the dosing issue. I want to go to the claims 4, 6, and 7 for a moment, if I can. With respect to claims 4, 6, and 7, the Board did, in fact, determine the entirety, the claim as a whole. Claim 4 as a whole, claim 6 as a whole, claim 7 as a whole. When you look at the Board's decision at Appendix page 33 in the final written decision, they go and start at Appendix page 31. They begin by talking about and the first part of the Board's discussion in their final written decision regarding those claims at pages 31 to 33 address the combination of the 212 patent, JESC, and JAHA. You only have to discuss, the Board only had to discuss the combination of those three references if they were addressing the claim 1 limitations which are incorporated into claim 4. There would be no need for the Board to talk about the combination, again, this is an obviousness argument, the combination of those three references if they were not considering the claims as a whole. Then afterwards, starting at Appendix page 34, they say, for all these reasons, we determine that the petitioner is shown by a preponderance of the evidence that a person of ordinary skill in the art would have a reason to combine the teachings of the 212 patent, Voswinkel-JESC and Voswinkel-JAHA, and would have a reasonable expectation of success in doing so. And then after that, so that's the dosing and the breadth issues. Then after that, they say, thus, we move on. And that's at page 34 of the Appendix. And that's where they start talking about the dry powder, they start talking about the inhalation device, and they start talking about the micron size which are expressly disclosed in the 212 patent. So they did exactly what UTC says they didn't, they did exactly what UTC says they should have. Talk about the first part of the claim, which is the dosing and the inhalation, and then with respect to the additional limitations in those claims, they address those too in the 212 patent. And we believe that substantial evidence supports the Board's finding with respect to the claims 4, 6, and 7. What if the 212 patent hadn't disclosed powder? If the 212 patent didn't disclose powder, they would have to find another reference out there that would disclose powder. Here though, even if it didn't disclose powder, and it does, and the 212 patent is very interesting, it's UTC's own patent and the disclosure is nearly identical to the patent that we're looking at, the 793. There's one sentence regarding powder and the particle size in the 212 patent, and the rest of the disclosure is solution. Council argues in their briefing that you can't bridge solution to powder and the Board didn't do that. Well, they did. If you look at the appendix, if you look at appendix page 33, the Board said that the 212 patent provides enough information for a person of ordinary skin layer to have made and used the invention defined by the claims of the 212 patent. They said the disclosure of the 212, which is solution, teaches you how to make a powder and use a dry powder inhaler. That is the bridge between a disclosure on solution in one hand and the 212 patent and how you get to dry powder, which they expressly claim. Council noted that the 212 patent doesn't talk about the dosing or the breaths, but it doesn't have to. That's JESC and JAHA. JESC and JAHA provide the dosing and provide the breath. 212 provides the dry powder and provides the bridge between disclosures of solutions and disclosures of powders. They argued, and there was quite a bit of argument in the oral hearing about enablement of the 212 patent. The point of that and the reason why that came up was UTC's only argument before the Board was a credibility determination between Dr. Gonda's testimony at the District Court and Dr. Gonda's testimony in the IPR. In other words, United got the 212 patent and then it had these presentations, these lost-winkle presentations and then after all of that they still tried to get a patent with little refinements. Exactly, and those little refinements are obvious. If you look at the chronology of what went on, the 212 patent is earlier in time than JESC and JAHA. As we argued in the petition and as the Board found, when you look at the 212 patent, it talks about administering a dry powder. This is supported by substantial evidence and that is supported by Dr. Gonda, which is unrebutted and the Board found that. The motivation to combine was provided by Dr. Hill and the Board relied on that. He said that patients, when you take a nebulized solution, it takes a long time. There's adherence to the treatment protocol and a person of already skilled in the art would be motivated to get a more convenient mode of administration. That's JESC and JAHA. That's the three breaths of JAHA and that's the dosing provided in JESC. Those references, time-wise, are after the 212 patent. When you look at the chronology in terms of obviousness of what a person of already skilled in the art would do, they would see UTC has a patent to dry powder, the exact same patent that they're asserting here, and then a person of skilled in the art looking at the 212 would say, how do I get this quicker? How do I make it more convenient to a patient? The Board found that and that's where you turn to JESC and JAHA. JESC and JAHA provide the dosing and the breaths. 212 does not need to provide that. It only needs to provide the dry powder and as the Board found at appendix page 33, the bridge between solution and powder. If there were not the JESC and the JAHA but only the 212 patents, it would be different? We believe no, but that issue is not before you, but I would argue that the 212 patent would maybe not anticipate but you can rely a single piece of prior art for obviousness and we would argue the 212 patent, if you look at the obviousness context, that provides all the disclosure you need with respect to the 793 patent claim 1. I see that I've got 2 seconds left. If you have any other questions, I'd be happy to address them. If not, Laquitia and myself, we appreciate your time. Thank you, counsel. Thank you, Your Honor. I'll try not to shout. I get kind of motivated when I see injustice below and I think we've got that here. Well, I hope you appreciate passion as well. I'd like to touch on a few points. One, Judge Rayna, one of your questions to me was do these articles even teach the delivered dose? There is a finding at APPX 15 that says although this teaching shows administration to patients of inhaled solutions with particular concentrations of traprosanil, it does not disclose the amount of solution administered which is necessary in order to calculate the amount of traprosanil administered. These articles did not teach any dose. Rather, you had to work through volumes and so forth with all those variables and that is strikingly absent from the final written decision below. With respect to these abstract books, I've heard a lot from my friend that is not anywhere to be found in the record below or certainly not the basis that the final written decision either won or to relies upon. Obviously, since we're reviewing an administrative record here, we can't come up with alternative basis for affirmance. You have to look at what the board did. There's no evidence that the journal articles that were relied upon are the same thing that appeared in abstract books. Now, Mr. Suk Duong has made new arguments about why these journals may or may not have been the abstract books, but that's all supposition and was never raised. In fact, the red brief 27 talks about the journals and the abstract books as different things and that's liquidity as own words. Moreover, Your Honor, this all came out down the road. We asked for approval to submit declarations pertaining to those conferences. You're right to question why with 20,000 people, couldn't you have a single person to corroborate any of this? We don't even know these abstract books exist. We asked for that, we were denied and that's worthy of a remand and demands a remand. With respect to unexpected results, we did provide in direct response to criticisms from Liquidia the particular unexpected results comparison of Traprostanal to other Traprostanal prior art. That starts at the bottom of our patent owner response, APPX416 and also in surreply in direct response at pages APPX584 to 585. The board's finding below that the patent owner does not ever allege unexpected results over this art is simply wrong. We know that the panel below overlooked certain evidence. That's the reason we have a final written decision too in this case. It's the same document that they overlooked here with respect to the unexpected results evidence and that alone gives us the right to a remand. Thank you counsel. The case is submitted.